**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Susan Bala and RSI Holdings, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTIONS TO DISMISS** |
| vs. | ) | |
| | ) | |
| Wayne Stenehjem, Paul Bowlinger, | ) | |
| Howard W. Wrigley, and Drew Wrigley, | ) | |
| in their individual capacities, and | ) | Case No. 1:09-cv-015 |
| Michael Cichy, | ) | |
| | ) | |
| Defendants. | ) | |

_____

        Before the Court are the Defendants' motions to dismiss filed on May 1, 2009; May 27,

2009; June 1, 2009; and June 25, 2009.  See Docket Nos. 5, 10, 12, and 15.  The Plaintiffs filed

responses in opposition to the motions on June 29, 2009; July 6, 2009; and July 16, 2009.  See

Docket Nos. 18, 21, and 26.  The Defendants filed reply briefs on July 8, 2009; July 9, 2009; and

July 28, 2009.  See Docket Nos. 24, 25, and 30.  Oral argument was held in Fargo, North Dakota on

November 13, 2009.  For the reasons set forth below, the Court grants the Defendants' motions.


**I.      BACKGROUND**

        In 1989, the State of North Dakota legalized simulcast parimutuel wagering on horse racing

conducted outside the state and simulcast to licensed off-track betting sites.  The North Dakota

Racing Commission administers this heavily regulated regime.  North Dakota statutory law limits

the entities that may conduct simulcast parimutuel wagering to charities and other "public-spirited

organizations."  See N.D.C.C. § 53-06.2-06.

In <u>United States v. Bala</u>, 489 F.3d 334, 336-37 (8th Cir. 2007), the Eighth Circuit Court of Appeals set forth the factual background of Susan Bala's and RSI Holding, Inc.'s involvement in the North Dakota wagering industry:

> In 1993, RSI became the sole entity licensed by the [North Dakota Racing] Commission to provide simulcast services to the charities licensed as [off-track betting] operators.  RSI as simulcast service provider contracted with out-of-state race tracks to provide satellite broadcast signals of live racing events to licensed [off-track betting] locations in North Dakota.  RSI also established and maintained the combined parimutuel pools of North Dakota wagers and performed many record-keeping functions.

> In 2001, Bala, the Commission, and interested North Dakota constituents such as horse breeders and the racing industry persuaded the North Dakota Legislature to amend its parimutuel wagering statutes to permit parimutuel "account wagering." Before account wagering, parimutuel bettors placed bets with [off-track betting] operators before the simulcast horse race, usually appearing in person and paying the [off-track betting] operator's teller in cash.  The various wagers were combined into a parimutuel pool.  After the race, approximately 80% of the pool was paid to winning bettors.  The remaining 20% was divided between the race track, the [off-track betting] operator, North Dakota taxes and fees, and RSI, the simulcast service provider.  With account wagering, bettors may establish accounts and place simulcast parimutuel wagers electronically, eliminating the need for cash-handling tellers. Rather than authorize multiple [off-track betting] operators to establish bettor accounts and receive account wagers, the account wagering statute provided that account wagers "may only be made through the licensed simulcast service provider," RSI.  N.D. Cent. Code § 53-06.2-10.1.  The way RSI conducted account wagering resulted in this prosecution.

On December 10, 2003, Bala, RSI, and others were charged in a twelve-count indictment in federal district court for conspiring to conduct and conducting an "illegal gambling business" within the meaning of 18 U.S.C. §§ 1955 and 371; violating 18 U.S.C. § 1084(a) when, being engaged in the business of betting and wagering, they knowingly made interstate wire transmissions of bets, wagers, and the information assisting in the placing of bets and wagers; and conspiring to use and using the proceeds of an illegal gambling business for the purpose of promoting the business and concealing their unlawful activity in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i).  <u>See</u> Case

No. 3:03-cr-112, Docket No. 1.   Trial commenced in federal court on January 18, 2005.   On February 4, 2005, a jury found Bala and RSI guilty on all twelve counts.   See Case No. 3:03-cr-112, Docket No. 88.   On July 20, 2005, Bala was sentenced to twenty-seven months imprisonment and ordered to forfeit $19,719,186 joint and several with the co-defendants.   See Case No. 3:03-cr-112, Docket No. 118.   RSI was ordered to pay a special assessment of $4,800 and forfeit $99,013,200. See Case No. 3:03-cr-112, Docket No. 117.   Bala and RSI appealed to the Eighth Circuit Court of Appeals, and the Eighth Circuit reversed the Plaintiffs' convictions, finding:

> The evidence at trial established that the North Dakota Racing Commission knew charities must receive the "net proceeds" of the account wagering that RSI, and only RSI, was authorized to conduct.   Yet the Commission neither drafted regulations prescribing how this complex task should be accomplished nor adequately monitored RSI's compliance.   Issues predictably arose.   Rather than pursue possible violations in state court, the Commission brought the complicated situation to federal authorities, who then commenced a federal prosecution based upon flawed interpretations of state law, of 18 U.S.C. § 1955, and of 18 U.S.C. § 1084.   The result was a trial at which the government failed to prove any of the offenses charged.

Bala, 489 F.3d at 343.

In 2003, the State of North Dakota brought civil and criminal actions against the Plaintiffs. See Docket Nos. 9-1 (State v. Racing Services, Inc., Cass County District Court, Case No. 09-03-C-2331) and 9-2 (State v. Bala et al., Cass County District Court, Case No. 09-03-K-4297).   In the civil action, the State alleged that RSI "had 'underreported' handle from October 2, 2002, through April 2003, in an amount of $98,975,620.00"; that RSI was in arrears in the amount of $1,336,841.84 in its payment of special funds due to the North Dakota Racing Commission; that RSI was in arrears in the amount of $840,635.98 in its payment of State general fund taxes; that RSI was in arrears in the amount of $6,329,463.06 to the North Dakota Racing Commission and the State's general fund. See Docket No. 9-1 (State v. Racing Services, Inc., Cass County District Court, Case No. 09-03-C-

2331).  In the criminal action, the State alleged that Bala and RSI operated an illegal gambling business under North Dakota law.  See Docket No. 9-2 (State v. Bala et al., Cass County District Court, Case No. 09-03-K-4297).  On August 1, 2005, the state district court dismissed the civil action without prejudice.  See Docket No. 9-3 (Order of Dismissal).  On September 14, 2005, the state district court dismissed the criminal action with prejudice, finding "that the State of North Dakota is [barred] from prosecution in the present matter pursuant to N.D.C.C. 29-03-13 as a result of the conviction for the acts charged and convicted in Federal District Court . . . ."  See Docket No. 9-4 (Order of Cass County District Court).

On April 7, 2009, Bala and RSI filed an action in federal district court, alleging violations of 42 U.S.C. § 1983, liability under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), and interference with business and prospective advantage.  RSI was formed as a Delaware corporation with its principle place of business located in Fargo, North Dakota.  Defendant Wayne Stenehjem is the Attorney General for the State of North Dakota.  Defendant Paul Bowlinger is the former Director of Racing for the North Dakota Racing Commission, an administrative agency of the State of North Dakota.  Defendant Drew Wrigley is the former United States Attorney for the State of North Dakota.  Defendant Howard W. Wrigley is the father of Drew Wrigley and a former commissioner and Chair of the Racing Commission from July 1, 2002 until he resigned in October 2003.  Defendant Michael Cichy is the former Simulcast Coordinator and Lead Race Control Manager for RSI.

On May 1, 2009; May 27, 2009; June 1, 2009; and June 25, 2009, the Defendants filed motions to dismiss the Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  The Defendants contend that the Plaintiffs have failed to plead facts that state a claim as a matter of law.

## II.    STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure sets forth the federal pleading requirements for civil cases.  Rule 8(a) provides that pleadings must contain:  "(1) a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought."  Fed. R. Civ. P. 8(a).

Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted.  When considering a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true.  "'However, the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal.'"  Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007) (quoting DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002)). The court may generally only look to the allegations contained in the complaint to make a Rule 12(b)(6) determination.  McAuley v. Fed. Ins. Co., 500 F.3d 784, 787 (8th Cir. 2007).  "[I]n considering a motion to dismiss, the district court may sometimes consider materials outside the pleadings, such as materials that are necessarily embraced by the pleadings and exhibits attached to the complaint."  Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)).  "A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond

a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to

relief."  Young v. City of St. Charles, Mo., 244 F.3d 623, 627 (8th Cir. 2001).

In the recent decision, Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the United States Supreme

Court clarified the pleading requirements under the Federal Rules of Civil Procedure necessary to

survive a motion to dismiss for failure to state a claim.  The United States Supreme Court stated,

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and
> plain statement of the claim showing that the pleader is entitled to relief."  As the
> Court held in [Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)], the pleading
> standard Rule 8 announces does not require "detailed factual allegations," but it
> demands more than an unadorned, the defendant-unlawfully-harmed-me accusation.
> A pleading that offers "labels and conclusions" or a "formulaic recitation of the
> elements of a cause of action will not do."  Nor does a complaint suffice if it tenders
> "naked assertion[s]" devoid of "further factual enhancement."
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face."  A claim has
> facial plausibility when the plaintiff pleads factual content that allows the court to
> draw the reasonable inference that the defendant is liable for the misconduct alleged.
> The plausibility standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.  Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Iqbal, 129 S. Ct. at 1949 (internal citations omitted).

## III.   LEGAL DISCUSSION

### A.   ATTORNEY GENERAL WAYNE STENEHJEM

The Plaintiffs allege that North Dakota Attorney General Wayne Stenehjem violated their

constitutional rights under 42 U.S.C. § 1983.  The Plaintiffs allege that Attorney General Stenehjem

conspired with the other Defendants to violate the Plaintiffs' rights against unreasonable searches

and seizures without probable cause, rights against malicious prosecution, rights to substantive due

process for filing indictments and charges based on false evidence, rights against taking without just

compensation, right to counsel, and right to due process. Attorney General Stenehjem contends that

the amended complaint fails to allege that he personally violated their constitutional rights, and that

absolute and qualified immunity bars the claims against him.

The amended complaint provides the following allegations regarding Attorney General

Stenehjem:

39. Defendants conspired and agreed that DREW WRIGLEY would engage
agents from the Federal Bureau of Investigation ("FBI") and the Internal
Revenue Service ("IRS") to investigate what CICHY had falsely reported.

40. On or about April 22, 2003, CICHY, BOWLINGER, DREW WRIGLEY
and/or STENEHJEM provided or caused to be provided the aforementioned
false information – that RSI was not properly licensed, that RSI had failed to
pay excise taxes, and that RSI violated [North Dakota] Racing Commission
regulations – to the FBI. Based upon that information, on or about April 28,
2003, search warrants were obtained to search RSI facilities including the
1318 Office.

41. On or about April 28, 2003 RSI facilities including the 1318 Office were
raided by agents from various state and federal agencies including the FBI,
the IRS, and the Office of the Attorney General of the State of North Dakota
searching for evidence of alleged illegal gambling activities. During the raid,
numerous items of RSI property . . . were confiscated and held by the various
governmental agencies involved.

. . .

44. On or about August 20, 2003, STENEHJEM threatened BALA that if she did
not turn over control of RSI to STENEHJEM by the next day and agree to the
immediate appointment of a receiver whom STENEHJEM had already
selected and instructed, STENEHJEM would ruin BALA and RSI. So
coerced, on or about August 21, 2003, BALA stipulated to the appointment
of a receiver.

45. On or about August 21, 2003, STENEHJEM commenced a civil law suit
titled *State ex rel Wayne Stenehjem v. Racing Services, Inc, et al*, Cass
County, North Dakota District Court Case No. 09-03-C-02331 ("*Stenehjem
v. RSI*"), against BALA personally and against RSI seeking to collect the

excise taxes alleged to be due on the account wagering activity. In addition, the law suit directed the appointment of a receiver to take over the operations of RSI. The State District Court appointed Wayne Drewes as receiver who took over management of RSI . . . .

46. From the time of the April 28, 2003 raid on the 1318 Office up to the appointment of STENEHJEM'S receiver, STENEHJEM, and/or other Defendants named herein, while acting under the color of State law, demanded and took payments totaling in excess of $1,482,189.64 from RSI in payment of excise taxes allegedly due on the account wagering activities. After the receiver was appointed, STENEHJEM, and/or other Defendants named herein, while acting under the color of State law, demanded and took an additional $450,000 in payments from RSI for excise taxes allegedly due on account wagering activities. Those exactions were taken even though the statutes and regulations in place at the time did not establish either an obligation to pay such taxes on account wagering activities or a due date for payment of parimutuel taxes on the activity.

. . .

50. On or about December 18, 2003, STENEHJEM caused the State of North Dakota to commence a state criminal action titled *State v. Bala, et al*, Cass County, North Dakota, District Court Case No. 09-03-K-4297 ("*State v. Bala*"), against BALA, RSI, and others alleging one count each of operating a gambling business illegal under state law . . . .

. . .

52. On or about February 2, 2004, BALA was informed that STENEHJEM had instructed the receiver not to pay the winning wagers of RSI patrons or RSI's operating expenses and to shut down the business operations of RSI.

53. On or about February 3, 2004, Plaintiffs filed for Chapter 11 Bankruptcy protection on behalf of RSI seeking to become debtor in possession in order to protect RSI's interests from the receivership and control imposed by STENEHJEM, and/or other Defendants named herein. STENEHJEM, acting through the State of North Dakota, moved to convert the bankruptcy from a Chapter 11 reorganization to a Chapter 7 liquidation. On or about June 15, 2004, the Bankruptcy Court granted the motion to convert the case to a Chapter 7 liquidation and appointing a Chapter 7 trustee to take over the bankruptcy estate of RSI. From that point on, Plaintiffs were denied the right to have any further involvement in the operations of RSI.

54.     Furthermore, STENEHJEM and DREW WRIGLEY instructed the receiver not to hire legal counsel to defend RSI in the criminal proceedings. STENEHJEM, DREW WRIGLEY, and/or other Defendants continued to oppose the use of RSI resources to retain legal counsel in the ongoing criminal and bankruptcy proceedings.  Ultimately, Defendants succeeded in causing the corporate entity, RSI, to become unable to obtain adequate representation in all of the legal proceedings it was a party to.

See Docket No. 9.

### 1)     42 U.S.C. § 1983

42 U.S.C. § 1983 establishes a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage" deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States.  "The traditional definition of acting under color of state law requires that a defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  Neighborhood Enterprises, Inc. v. City of St. Louis, 540 F.3d 882, 885 (8th Cir. 2008) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "'[A] defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.'"  Ottman v. City of Independence, Mo., 341 F.3d 751, 761 (8th Cir. 2003) (quoting Roe v. Humke, 128 F.3d 1213, 1215 (8th Cir. 1997)).

"To prove a § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff."  Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999).  The plaintiff must also show a deprivation of a constitutional right or privilege in order to prevail on a

Section 1983 civil conspiracy claim.  White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008).  "'The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the coconspirators to achieve the conspiracy's aims.'"  Id. at 816 (quoting Larson by Larson v. Miller, 76 F.3d 1446, 1458 (8th Cir. 1996)).  "In order to state a conspiracy claim, the plaintiff must at least allege that 'the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding,' and [provide] some facts suggesting such a 'meeting of the minds.'"  Haley v. Dormire, 845 F.2d 1488, 1490 (8th Cir. 1988) (quoting White v. Walsh, 649 F.2d 560, 561 (8th Cir. 1981)).  A complaint that sets forth vague, conclusory, or general allegations that the defendants engaged in a conspiracy cannot withstand a motion to dismiss for failure to state a claim.  See Powell v. Tordoff, 911 F. Supp. 1184, 1196 n.8 (N.D. Iowa 1995).

        The Plaintiffs' amended complaint fails to allege that Attorney General Stenehjem violated their federal rights.  The amended complaint sets forth vague, conclusory, and general allegations of misconduct by the Attorney General.  The basis for the complaint is that Attorney General Stenehjem initiated civil and criminal actions against the Plaintiffs and was involved in the bankruptcy action filed by RSI.  Attorney General Stenehjem, as the chief law enforcement officer of the State of North Dakota, has broad powers to investigate alleged illegal gambling operations and to institute and prosecute actions relating to the illegal gambling operations.  See N.D.C.C. § 53-06.2-13.[1]  Attorney General Stenehjem's participation in investigating alleged illegal gambling

---

[1] N.D.C.C. § 53-06.2-13 provides:

    1.      The attorney general shall represent the state in all hearings before the commission and shall
            prosecute all criminal proceedings arising from violations of this chapter.  The attorney

operations at RSI is consistent with the authority vested to him by N.D.C.C. § 53-06.2-13. Any communications that the Attorney General had with the receiver during the bankruptcy proceedings did not violate the Plaintiffs' federal rights because he (the Attorney General) was not a legal advisor for the receiver, but rather was an advocate for the State. The Court finds that the Plaintiffs have failed to state a claim under 42 U.S.C. § 1983 upon which relief can be granted. More important, even if the Plaintiffs' complaint had alleged a violation of their federal rights, Attorney General Stenehjem's actions were protected under principles of immunity.

### 2)    ABSOLUTE AND QUALIFIED IMMUNITY

When considering claims of governmental immunity, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Burns v. Reed, 500 U.S. 478, 486 (1991). However, the United States Supreme Court has granted some government officials absolute immunity: the president, judges, prosecutors, witnesses,

---

general may require payment for any services rendered to the racing commission. Payment for the services must be deposited in the attorney general's operating fund. The commission may employ private counsel for adoption of rules and to ensure that its hearings are conducted fairly.

2. a.    The attorney general may audit and investigate service providers, totalizator companies, site operators, or organizations applying to conduct or conducting pari-mutuel wagering. The attorney general may:

   (1)    Inspect all sites in which pari-mutuel wagering is conducted.

   (2)    Inspect all pari-mutuel wagering equipment and supplies.

   (3)    Seize, remove, or impound any pari-mutuel equipment, supplies, or books and records for the purpose of examination and inspection.

   (4)    Inspect, examine, photocopy, and audit all books and records.

   b.    The commission shall reimburse the attorney general for auditing and investigation. Payment for auditing and investigation must be deposited in the attorney general's operating fund.

and officials performing "quasi-judicial" functions. Mitchell v. Forsyth, 472 U.S. 511, 520 (1985). The differences between absolute immunity and qualified immunity are significant. Absolute immunity disposes of the action at the outset. Qualified immunity protects government officials from civil lawsuits unless "'their conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" Anderson v. Larson, 327 F.3d 762, 769 (8th Cir. 2003) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). While absolute immunity protects the acts of a prosecutor for conduct that is adversarial in nature, such as initiating and pursuing a criminal prosecution and presenting the state's case at trial, prosecutors are entitled to qualified immunity for conduct that is investigative or administrative in nature. Buckley v. Fitzsimmons, 509 U.S. 259, 272-74 (1993).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). The United States Supreme Court has generally interpreted qualified immunity as shielding "'all but the plainly incompetent or those who knowingly violate the law.' In other words, 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

Courts conduct a two-part inquiry to determine whether a public official is entitled to qualified immunity. "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a

12

constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.[2]  Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009).

It is well-established that prosecutors are absolutely immune from civil liability for the actions taken in their role as quasi-judicial officers.  See Imbler v. Pachtman, 424 U.S. 409 (1976). In Imbler, the United States Supreme Court stated,

> The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grant jurors acting within the scope of their duties.  These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.
>
> . . .
>
> If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution.  A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court.  The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.  Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate.

Id. at 422-23, 424-45.  Absolute immunity also extends to state attorneys general and assistant state attorneys general.  See Murphy v. Morris, 849 F.2d 1101, 1105 (8th Cir. 1988) (finding that absolute immunity extended to an assistant state attorney general defending state officials in prisoner civil rights litigation).  State attorneys general and assistant state attorneys general are absolutely immune "in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately

---

[2]  While it may often be appropriate to conduct the qualified immunity analysis first by determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Instead, the court has the discretion to determine which of the two prongs should be addressed first in light of the circumstances of the particular case. See Pearson v. Callahan, 129 S. Ct. at 818 (overruling Saucier v. Katz, 533 U.S. 194 (2001)).

associated with the judicial phase of the criminal process.'" Zar v. South Dakota Bd. of Examiners of Psychologists, 976 F.2d 459, 466 (8th Cir. 1992) (quoting Burns, 500 U.S. at 486). However, where the conduct of the state attorneys general and assistant state attorneys general is more akin to that of an investigator, the attorneys are protected by qualified immunity rather than absolute immunity:

> while some of a prosecuting attorney's preliminary investigative work may be analogous to a police detective's investigation, and should therefore be only qualifiedly immune, investigation necessary to the prosecutor's decision to initiate criminal proceedings is within the quasi-judicial aspect of the prosecutor's job and therefore is absolutely immune from a civil suit for money damages.

Zar, 976 F.2d at 466 (quoting Williams v. Hartje, 827 F.2d 1203, 1210 (8th Cir. 1987)).

Absolute prosecutorial immunity also applies to federal government attorneys who participate in administrative proceedings. See Butz v. Economou, 438 U.S. 478 (1978). In Butz, the United States Supreme Court analogized government administrative proceedings to criminal prosecutions and held that a Department of Agriculture attorney, who prosecuted an enforcement proceeding against a commodity future commission merchant, performed functions similar to that of a prosecutor and, therefore, was entitled to absolute immunity in a damages action for Bivens liability. The United States Supreme Court stated,

> We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought . . . .
>
> The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete. While there is not likely to be anyone willing and legally able to seek damages from the officials if they do *not*

14

> authorize the administrative proceedings, there is a serious danger that the decision
> to authorize proceedings will provoke a retaliatory response.  An individual targeted
> by an administrative proceeding will react angrily and may seek vengeance in the
> courts.  A corporation will muster all of its financial and legal resources in an effort
> to prevent administrative sanctions.   "When millions may turn on regulatory
> decisions, there is a strong incentive to counter-attack."

Butz, 438 U.S. at 515-16 (internal citations omitted) (emphasis in original).

Federal courts of appeal have extended absolute immunity to the conduct of prosecutors in civil actions.  See Mendenhall v. Goldsmith, 59 F.3d 685 (7th Cir. 1995) (finding that a prosecuting attorney was entitled to absolute immunity for administrating civil forfeiture proceedings because the attorney was functioning in an enforcement role analogous to that of a prosecutor); Schrob v. Catterson, 948 F.2d 1402 (3d Cir. 1991) (finding that a prosecutor was entitled to absolute immunity for his conduct in filing a complaint and applying for a warrant to seize a business in a civil forfeiture proceeding); Fry v. Melaragno, 939 F.2d 832 (9th Cir. 1991) (finding that attorneys for the Internal Revenue Service who handled a tax deficiency claim were entitled to absolute immunity because the conduct of the attorneys was intimately associated with the judicial phase of the tax litigation).

In the present case, Attorney General Stenehjem prosecuted a civil action in state district court to recover $6,329,463.06 from the Plaintiffs pursuant to N.D.C.C. § 52-06-33.  As such, the Court finds that this conduct is clearly protected by absolute immunity.  However, the Plaintiffs allege that the conduct of Attorney General Stenehjem was investigatory, rather than prosecutorial, which would provide the Attorney General with qualified, rather than absolute, immunity.

a)      <u>COMMUNICATIONS WITH THE RECEIVER</u>

The amended complaint alleges that Attorney General Stenehjem instructed the receiver of RSI to make tax payments even though North Dakota law did not require the payments, to not pay the winning wagers of RSI patrons, to not pay RSI's operating expenses, to shut down the business operations of RSI, and to not hire legal counsel in the criminal proceedings. <u>See</u> Docket No. 9, ¶¶ 46, 52, and 54.  In the state civil law action, <u>State v. Racing Services, Inc.</u>, Case No. 09-03-C-2331, the state district court appointed a receiver to manage RSI.  <u>See</u> Docket No. 9, ¶ 45.  "A receiver is an officer or arm of the court and acts under the discretion and supervision of the court." <u>Perry Ctr., Inc. v. Heitkamp</u>, 576 N.W.2d 505, 511 (N.D. 1998).  Even if Attorney General Stenehjem had instructed the receiver of  RSI to act in a particular manner, the receiver was under the complete control of the state district court.  Attorney General Stenehjem did not possess the power to control the receiver's actions.  Therefore, the receiver had no allegiance to the Attorney General or the State and, without evidence to show otherwise, is presumed to have been under the supervision of the state district court.

The Court is without sufficient information to determine whether Attorney General Stenehjem was functioning in an enforcement role analogous to that of a prosecutor when communicating with RSI's receiver.  Nonetheless, even if Attorney General Stenehjem is not shielded by absolute immunity for communicating with the receiver, he is at least protected by qualified immunity.  Because the receiver was required to act under the discretion of the state district court, and not the State, the Court finds that Attorney General Stenehjem's communications with the receiver did not violate a clearly established constitutional or statutory right of which a

16

reasonable person would have known.  Accordingly, Attorney General Stenehjem's conduct of communicating with RSI's receiver is protected by qualified immunity.

**b)**   **NEGOTIATIONS**

The Plaintiffs allege that Attorney General Stenehjem threatened Bala that if she did not turn over the control of RSI to him and agree to an appointment of a receiver, that he would "ruin" the Plaintiffs.  See Docket No. 9, ¶ 44.  In Arnold v. McClain, 926 F.2d 963 (10th Cir. 1991), the Tenth Circuit Court of Appeals determined that a prosecutor's conduct of negotiating  with the plaintiff was subject to absolute immunity.  In Arnold, the prosecutor gave the plaintiff the choice of resigning from his position as a police officer or having criminal perjury charges filed against the plaintiff for testifying inconsistently under oath.  The court stated,

> As stated by the Supreme Court in Santobello v. New York, 404 U.S. 257, 260 (1971): "[t]he disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice.  Properly administered, it is to be encouraged."  We find the "agreement" between the two parties herein to be sufficiently analogous to a plea bargain to warrant the same deference to the prosecutor's discretion.  Accordingly, we find Defendant is entitled to absolute prosecutorial immunity for his actions in securing the resignation of [the plaintiff].

Arnold, 926 F.2d at 967.

Other circuits have also determined that a prosecutor's conduct of negotiating is entitled to absolute immunity.  See Schloss v. Bouse, 876 F.2d 287 (2d Cir. 1989) (finding that a prosecutor's action of negotiating a release from civil liability in exchange for promising not to file criminal charges was entitled to absolute immunity); McGruder v. Necaise, 733 F.2d 1146 (5th Cir. 1984) (finding that a prosecutor was protected by absolute immunity for dismissing a criminal prosecution in exchange for a civil settlement); but see Schrob v. Catterson, 948 F.2d 1402 (3d Cir. 1991)

17

(finding that a prosecutor's actions in managing and negotiating the return of seized property were not entitled to absolute immunity because the prosecutor was acting in an administrative role). The Court finds that Attorney General Stenehjem's conduct of negotiating with Bala is protected by absolute immunity because such conduct was inextricably linked to the prosecution of the civil or criminal actions and was neither investigative nor administrative in nature.

c)      **PARTICIPATING IN RSI'S BANKRUPTCY**

The Plaintiffs contend that Attorney General Stenehjem participated in RSI's bankruptcy proceedings in violation of their federal rights. The Plaintiffs allege that Attorney General Stenehjem moved to convert RSI's chapter 11 reorganization to a chapter 7 liquidation. See Docket No. 9, ¶ 53. The bankruptcy court granted Attorney General Stenehjem's motion and converted RSI's chapter 11 reorganization to a chapter 7 liquidation and appointed a trustee to take over RSI, which denied the Plaintiffs any further involvement in the operations of RSI. Attorney General Stenehjem participated in RSI's bankruptcy proceedings as an advocate for the State of North Dakota. 11 U.S.C. § 1112(b)(1) allows a court "on request of a party in interest, and after notice and a hearing" to convert a chapter 11 bankruptcy action to a chapter 7 action, or dismiss it, whichever is in the "best interests of creditors and the estate." The record is devoid of any evidence that the conversion of the bankruptcy from a chapter 11 reorganization to a chapter 7 liquidation violated 11 U.S.C. § 1112(b)(1). The Court finds that Attorney General Stenehjem did not violate the Plaintiffs' federal constitutional or statutory rights when he moved to convert RSI's bankruptcy proceeding from a chapter 11 reorganization to a chapter 7 liquidation. As such, he is entitled to qualified immunity.

### d)   **CONSPIRACY**

The Plaintiffs argue that the "Defendants conspired and agreed that DREW WRIGLEY would engage agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") to investigate" Cichy's false allegations.  See Docket No. 9, ¶ 39.  To establish a conspiracy, the Plaintiffs must allege that "'the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding,' and [provide] some facts suggesting such a 'meeting of the minds.'"  Haley v. Dormire, 845 F.2d 1488, 1490 (8th Cir. 1988) (quoting White v. Walsh, 649 F.2d 560, 561 (8th Cir. 1981)).  The Plaintiffs have failed to allege any specific facts to suggest a meeting of the minds towards an unconstitutional action.  The United States Supreme Court has clarified that a pleading which provides "labels and conclusions" and only "'naked assertion[s]' devoid of 'further factual enhancement'" fails to satisfy the pleading requirements under Rule 8 of the Federal Rules of Civil Procedure.  Iqbal, 129 S. Ct. at 1949 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007)).  The Court finds that the Plaintiffs' vague, general, and conclusory allegations of a conspiracy are insufficient to satisfy Rule 8 of the Federal Rules of Civil Procedure and Iqbal.

### B.   **PAUL BOWLINGER**

The Plaintiffs allege that Paul Bowlinger, the former Director of Racing for the North Dakota Racing Commission, violated their constitutional rights under 42 U.S.C. § 1983.  The Plaintiffs allege that Bowlinger conspired with the other Defendants to violate the Plaintiffs' rights against unreasonable searches and seizures without probable cause, rights against malicious prosecution, rights to substantive due process for filing indictments and charges based on false evidence, rights

against taking without just compensation, right to counsel, and right to due process.  Bowlinger

contends that the complaint fails to allege that he personally violated their constitutional rights, and

that absolute and qualified immunity bars the claims against him.

The amended complaint provides the following allegations regarding Bowlinger:

20.    At a regular meeting of the Racing Commission held on or about September 12, 2002, in which both BOWLINGER and HOWARD WRIGLEY participated, BOWLINGER was directed to draft proposed administrative regulations with the assistance of the Attorney General's office to control account wagering activities authorized by the legislature.

. . .

22.    Moreover, if the 1995 version of the Take-Out Statute – § 53-06.2-11 – were applied to account wagering, it would result in a violation of the Commerce Clause contained in Article I, Section 8 of the United States Constitution because it would subject account wagering, as interstate commerce, to the risk of double taxation and to discriminatory taxation . . . . The 1995 Take-out Statute would also discriminate against interstate commerce because the tax rates set forth therein are overly burdensome on interstate account wagering due to the lower margins available to cover the expenses involved in account wagering.  The 2007 Legislature corrected the Commerce Clause problems as well by decreasing the tax burden for account wagering to rates substantially lower than the rates for intrastate live-race and off-track simulcast wagering.

23.    To make matters worse, BOWLINGER and HOWARD WRIGLEY failed to draft and promulgate account wagering regulations or to cause account wagering regulations to be drafted and promulgated.  In fact, the Racing Commission did not adopt regulations to address account wagering until 2007.  Until then, N.D. Admin. Code. § 69.5-01-11-04(3) stated "[a] service provider may not be licensed as a simulcast operator."  Furthermore, § 69.5-01-11-06(5) left the simulcast operator (the charity/public spirited organization) solely responsible for the payment of all take-outs to the State.

. . .

34.    On or about April 8, 2003, CICHY retaliated against BALA and RSI by calling BOWLINGER, and telling him that the 1318 Office was operating

without being licensed as an off-track betting simulcast site using the terms "rogue site" and "stealth site" to describe the location.

35.     BOWLINGER contacted the North Dakota Attorney General's office with the information supplied by CICHY.  Shortly thereafter, a meeting was arranged between BOWLINGER, STENEHJEM, and DREW WRIGLEY to determine how to address CICHY'S allegations.

36.     BOWLINGER and/or the other Defendants, knowingly provided false evidence which all of the Defendants and their respective investigators adopted and ratified to the effect that RSI was not licensed to conduct account wagering, that RSI had failed to pay lawfully imposed excise taxes, and that the account wagering activities of RSI were conducted in violation of then-existing Racing Commission regulations.  In fact, RSI was at all relevant times fully licensed to conduct account [wagering], there were no regulations adopted pursuant to the requirements of North Dakota law, and in particular in compliance with N.D.C.C. Chapter 28-32 governing account wagering until 2007 and no valid taxes were authorized which were applicable to RSI's account wagering activities.

. . .

38.     The false evidence proffered by BOWLINGER and/or other Defendants caused or significantly contributed to the flawed prosecutions of BALA and RSI resulting in the damages suffered by Plaintiffs.

39.     Defendants conspired and agreed that DREW WRIGLEY would engage agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") to investigate what CICHY had falsely reported.

40.     On or about April 22, 2003, CICHY, BOWLINGER, DREW WRIGLEY and/or STENEHJEM provided or caused to be provided the aforementioned false information – that RSI was not properly licensed, that RSI had failed to pay excise taxes, and that RSI violated Racing Commission regulations – to the FBI.

See Docket No. 9.

1)        **FAILURE TO DRAFT REGULATIONS**

The Plaintiffs allege that Bowlinger, as the former Director of Racing for the North Dakota Racing Commission, failed to draft or promulgate regulations until 2007 to control account wagering activities.  See Docket No. 9, ¶ 23.   Until 2001, only two types of parimutuel wagering were conducted in North Dakota – live race wagering and off-track simulcast wagering.  N.D.C.C. § 53-06.2-10.1 (1999).  Only charities and other public spirited organizations could conduct parimutuel wagering under either type.  N.D.C.C. § 53-06.2-06 (1999).  In 2001, the North Dakota Legislative Assembly allowed for a third type of parimutuel wagering – account wagering – which allowed bettors to place wagers directly into on-track pools by telephone regardless of where the track was located.  See N.D.C.C. § 53-06.2-10.1 (2001).  N.D.C.C. § 53-06.2-10.1 (2001) did not expressly require that payments be made to the State from account wagering activities.  In 2001, RSI was the only simulcast service provider that was authorized and licensed to conduct account wagering in North Dakota.  In 2007, the North Dakota Legislative Assembly amended the state's statutory laws to specify the amount that must be deducted from account wagering activities.  See N.D.C.C. § 53-06.2-11 (2007).

The Plaintiffs allege that Bowlinger, as the former Director of Racing for the North Dakota Racing Commission, failed to draft and promulgate account wagering regulations or to cause account wagering regulations to be drafted and promulgated until 2007.  The Plaintiffs contend that until 2007, "N.D. Admin. Code § 69.5-01-11-04(3) stated, '[a] service provider may not be licensed as a simulcast operator.'   Furthermore, § 69.5-01-11-06(5) left the simulcast operator (the charity/public spirited organization) solely responsible for the payment of all take-outs to the State." See Docket No. 9, ¶ 23.  Assuming this allegation is true, Bowlinger's failure did not violate the

22

Plaintiffs' constitutional or statutory rights.  At most, the Plaintiffs allege that Bowlinger was incompetent and performed his job poorly.

The power to implement new regulations rested with the North Dakota Racing Commission, not Bowlinger.  See N.D.C.C. § 53-06.2-05.  N.D.C.C. § 53-06.2-05(6) provides, in relevant part: "The commission may [a]dopt additional rules for the administration, implementation, and regulation of activities conducted pursuant to this chapter."  Bowlinger's statutory duties are limited to enforcing the rules and orders of the North Dakota Racing Commission and performing other duties the Racing Commission prescribes.  N.D.C.C. § 53-06.2-03.  Accordingly, Bowlinger is not liable under 42 U.S.C. § 1983 for enforcing the rules and regulations that existed in 2003 when the state and federal cases were filed, nor is Bowlinger liable for the North Dakota Racing Commission's failure to draft and promulgate new administrative rules and regulations until 2007.

More important, even if Bowlinger were found to be legally responsible in some way for failing to promulgate administrative rules addressing account wagering until 2007, the Court finds that his conduct would be protected by absolute immunity.  See Redwood Vill. P'ship v. Graham, 26 F.3d 839 (8th Cir. 1994).  In Redwood Vill. P'ship, the Eighth Circuit Court of Appeals held that absolute immunity protects executive officials acting in a legislative function.  The defendants were employees of the North Dakota Department of Human Services, an administrative agency of the executive branch of the state government.  The plaintiffs alleged the defendants violated their federal rights by promulgating administrative rules for the North Dakota Department of Human Services. The Eighth Circuit determined that the defendants' conduct in promulgating the rules was protected by absolute immunity.  The court stated,

> We recognize the tension between the "interest in having governmental officials
> exercise their judgment free of the fear of burdensome litigation" and the "interest

23

in checking improper official conduct and in providing wronged individuals with adequate remedies for their injuries."  The threat of damages liability not only encourages officials to carry out their duties in a lawful manner, but also "can create perverse incentives that operate to *inhibit* officials in the proper performance of their duties."  We conclude that exposure to liability for monetary damages would unduly inhibit executive officials when carrying out the quasi-legislative act of rulemaking. We therefore hold that executive officials are absolutely immune from suits for money damages under section 1983 for their promulgation of rules . . . .

Redwood Vill. P'ship, 26 F.3d at 842 (internal citations omitted) (emphasis in original).

The Court finds that the ruling in Redwood Vill. P'ship applies to the members and employees of the North Dakota Racing Commission who were involved in promulgating the Racing Commission's administrative rules and regulations.  Further, even if Bowlinger were only entitled to qualified immunity for his alleged participation in promulgating administrative rules for the North Dakota Racing Commission, his conduct would be shielded from liability under 42 U.S.C. § 1983 because there is no evidence that Bowlinger violated clearly established constitutional or statutory rights of which a reasonable person would have known.

## 2)   **MALICIOUS PROSECUTION**

The Plaintiffs also allege that Bowlinger "knowingly provided false evidence which all of the Defendants and their respective investigators adopted and ratified to the effect that RSI was not licensed to conduct account wagering, that RSI had failed to pay lawfully imposed excise taxes, and that the account wagering activities of RSI were conducted in violation of then-existing Racing Commission regulations."  See Docket No. 9, ¶ 36.  The Plaintiffs do not provide, nor did the Court find, any case law in support of the Plaintiffs' assertion that Bowlinger's alleged act of knowingly providing false evidence to law enforcement violated their federal rights.  The Plaintiffs are

essentially claiming that Bowlinger fabricated evidence and participated in their malicious prosecution which is a tort law claim under state law.

42 U.S.C. § 1983 does not provide a remedy for a violation of state tort law. Occhino v. United States, 686 F.2d 1302, 1311 (8th Cir. 1982).  "Section 1983 provides a remedy only for violations of rights secured by federal statutes or the Constitution."  Gunderson v. Schlueter, 904 F.2d 407, 409 (8th Cir. 1990).  The Eighth Circuit has repeatedly held that malicious prosecution is not cognizable under 42 U.S.C. § 1983.  See Kurtz v. City of Shrewsbury, 245 F.3d 753, 758 (8th Cir. 2001) ("[T]his court has uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury.").  Accordingly, the Plaintiffs are not entitled to relief under 42 U.S.C. § 1983 for Bowlinger allegedly providing false information to law enforcement officials.  Counsel for the Plaintiffs conceded at oral argument that malicious prosecution is not a cognizable claim under 42 U.S.C. § 1983 in the Eighth Circuit.

### 3)   CONSPIRACY

The Plaintiffs allege that the "Defendants conspired and agreed that DREW WRIGLEY would engage agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") to investigate" Cichy's allegations.  See Docket No. 9, ¶ 39.  The Court has determined that the Plaintiffs' allegation of a conspiracy to investigate Cichy's allegations was insufficient to satisfy Rule 8 of the Federal Rules of Civil Procedure and Iqbal.

C.      **HOWARD WRIGLEY**

The Plaintiffs allege that Howard Wrigley, the father of Drew Wrigley and a former commissioner and Chair of the North Dakota Racing Commission, violated their federal rights under 42 U.S.C. § 1983. The Plaintiffs allege that Howard Wrigley conspired with the other Defendants to violate the Plaintiffs' rights against unreasonable searches and seizures without probable cause, rights against malicious prosecution, rights to substantive due process for filing indictments and charges based on false evidence, rights against taking without just compensation, right to counsel, and right to due process. Howard Wrigley contends that the amended complaint fails to allege that he personally violated their federal rights, and that absolute and qualified immunity bars the claims against him.

The amended complaint provides the following allegations regarding Howard Wrigley:

7.      Defendant Howard W. Wrigley ("HOWARD WRIGLEY") is the father of DREW WRIGLEY. HOWARD WRIGLEY was appointed by the Governor of North Dakota to sit as a commissioner on the Racing Commission for a five-year term beginning on or about July 1, 2002 and was the Chair of the Racing Commission from July of 2003 until he resigned in October of 2003. HOWARD WRIGLEY is named herein in his individual capacity for purposes of liability under 42 U.S.C. §§ 1983 and 1985.

. . .

20.      At a regular meeting of the Racing Commission held on or about September 12, 2002, in which both BOWLINGER and HOWARD WRIGLEY participated, BOWLINGER was directed to draft proposed administrative regulations with the assistance of the Attorney General's office to control account wagering activities authorized by the legislature.

. . .

23.      To make matters worse, BOWLINGER and HOWARD WRIGLEY failed to draft and promulgate account wagering regulations or to cause account wagering regulations to be drafted and promulgated. In fact, the Racing

26

Commission did not adopt regulations to address account wagering until 2007. Until then, N.D. Admin. Code. § 69.5-01-11-04(3) stated "[a] service provider may not be licensed as a simulcast operator." Furthermore, § 69.5-01-11-06(5) left the simulcast operator (the charity/public spirited organization) solely responsible for the payment of all take-outs to the State.

. . .

37.   HOWARD WRIGLEY, as an agency head, failed to properly supervise or control his agency, BOWLINGER, and/or other Defendants through deliberate indifference to or the tacit authorization of the improper and offensive acts alleged herein of BOWLINGER and/or other Defendants.

. . .

39.   Defendants conspired and agreed that DREW WRIGLEY would engage agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") to investigate what CICHY had falsely reported.

. . .

48.   On or about October 8, 2003, then Racing Commission Chair, HOWARD WRIGLEY resigned from the Racing Commission because of a perceived conflict of interest due to the investigation his son, DREW WRIGLEY, was conducting against RSI and BALA.

. . .

51.   The Racing Commission ordinarily held an annual meeting in November of each year to, among other things, award licenses to various entities involved in parimutuel wagering. From 1993 through 2002, RSI had been licensed as the sole simulcast service provider in North Dakota by the Racing Commission each November. However, in late 2003, Defendants conspired and agreed to cause the Racing Commission to postpone the annual meeting and the awarding of licenses until after the ill-fated and specious criminal proceedings against BALA and RSI were commenced. Accordingly, on or about December 22, 2003, the Racing Commission held its annual meeting rejecting RSI's request for renewal of its simulcast service provider license because of the pending false criminal charges. Instead, the sole simulcast service provider license was awarded to an entity known as Lien Games, Inc., where CICHY was employed at the time. CICHY and one or more of the

27

other Defendants, conspired to maneuver the license away from RSI to Lien Games, Inc., thereby eliminating any opportunity RSI would have for continued business.

<u>See</u> Docket No. 9.


### 1)       **HOWARD WRIGLEY'S RESIGNATION**

The Plaintiffs allege that Howard Wrigley resigned from the North Dakota Racing Commission on October 8, 2003 because of a perceived conflict of interest due to his son, former United States Attorney Drew Wrigley, prosecuting the Plaintiffs.  <u>See</u> Docket No. 9, ¶ 48.  The Plaintiffs do not allege, nor does the Court find, that Howard Wrigley violated their federal rights when he attended a September 12, 2002 Racing Commission meeting and later resigned from the Racing Commission.


### 2)       **FAILURE TO PROMULGATE RULES**

The Plaintiffs allege that Howard Wrigley failed to draft and promulgate account wagering rules or regulations or to cause the regulations to be drafted.  <u>See</u> Docket No. 9, ¶ 23.  N.D.C.C. § 53-06.2-05(6) provides the Racing Commission with the authority to adopt additional rules for the administration, implementation, and regulation of activities conducted with respect to parimutuel horse racing.  The Racing Commission <u>as a whole</u> had the authority to implement regulations. Howard Wrigley, as a member of the Racing Commission, was not solely responsible for implementing any administrative rules or regulations.

The Court finds that the failure of the North Dakota Racing Commission to promulgate administrative rules or regulations prior to 2007 did not violate the Plaintiffs' federal constitutional

or statutory rights.  The Plaintiffs did not have a federal constitutional or statutory right to the Racing Commission promulgating new regulations.  There is no evidence that the administrative rules which were in effect in 2003 violated their federal rights.  The Plaintiffs have also failed to allege that Howard Wrigley violated their federal constitutional or statutory rights by failing to promulgate new regulations while serving as either a commissioner or the Chair of the Racing Commission.  As such, there is a failure to state a proper claim under 42 U.S.C. § 1983.

More important, the Court finds that even if the then-existing rules did violate the Plaintiffs' federal rights, Howard Wrigley, as a member of the Racing Commission, is protected by absolute immunity.  See Redwood Vill. P'ship v. Graham, 26 F.3d 839 (8th Cir. 1994) (finding that executive officials from the Department of Human Services were protected by absolute immunity from liability under 42 U.S.C. § 1983 for the rules they promulgated because they were acting in a quasi-legislative function).

### 3)   SUPERVISION OF BOWLINGER

The Plaintiffs further allege that Howard Wrigley, as a former Chair of the North Dakota Racing Commission, failed to properly supervise Bowlinger and the Racing Commission. See Docket No. 9, ¶ 37.  The North Dakota Century Code does not set forth the duties of the Chair of the Racing Commission.  It only describes the duties of the Racing Commission as a body and the Director of Racing for the Racing Commission.  "[A] supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996).   "The standard of liability for failure to train is

29

deliberate indifference.  The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" <u>Brockinton v. City of Sherwood, Ark.</u>, 503 F.3d 667, 673 (8th Cir. 2007) (quoting <u>Wilson v. City of N. Little Rock</u>, 801 F.2d 316, 322 (8th Cir. 1986)).

It is unclear under North Dakota law whether Howard Wrigley, as the Chair of the Racing Commission, was responsible for supervising and training the Director of Racing, Paul Bowlinger. Even if Howard Wrigley were responsible for training and supervising Bowlinger, the Plaintiffs have failed to allege a single fact to show that Howard Wrigley was deliberately indifferent in supervising and training Bowlinger.  More important, the Court has determined that Bowlinger did not violate the Plaintiffs' federal constitutional or statutory rights.  Therefore, even if Howard Wrigley failed to properly supervise Bowlinger, the Plaintiffs' claim against Howard Wrigley for failure to supervise fails as a matter of law.

## D.     DREW WRIGLEY

The Plaintiffs allege that former United States Attorney Drew Wrigley conspired with the other Defendants to violate the Plaintiffs' rights against unreasonable searches and seizures without probable cause, rights against malicious prosecution, rights to substantive due process for filing indictments and charges based on false evidence, rights against taking without just compensation, right to counsel, and right to due process in violation of <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).  Former United States Attorney Wrigley contends that the amended complaint fails to allege facts sufficient to state a claim for relief under <u>Bivens</u>, and that absolute and qualified immunity bars the claims against him.

30

The amended complaint provides the following allegations regarding former United States

Attorney Drew Wrigley:

6.     At all relevant times hereto, Defendant Drew Wrigley ("DREW WRIGLEY")
       was the United States Attorney for the District of North Dakota but is named
       herein in his individual capacity for purposes of liability under [*Bivens v. Six
       Unknown Named Agents of Fed. Bureau of Narcotics*], 403 U.S. 388 (1971).

. . .

35.    BOWLINGER contacted the North Dakota Attorney General's office with
       the information supplied by CICHY.  Shortly thereafter, a meeting was
       arranged between BOWLINGER, STENEHJEM, and DREW WRIGLEY to
       determine how to address CICHY'S allegations.

36.    BOWLINGER and/or the other Defendants, knowingly provided false
       evidence which all of the Defendants and their respective investigators
       adopted and ratified to the effect that RSI was not licensed to conduct
       account wagering, that RSI had failed to pay lawfully imposed excise taxes,
       and that the account wagering activities of RSI were conducted in violation
       of then-existing Racing Commission regulations.  In fact, RSI was at all
       relevant times fully licensed to conduct account [wagering], there were no
       regulations adopted pursuant to the requirements of North Dakota law, and
       in particular in compliance with N.D.C.C. Chapter 28-32 governing account
       wagering until 2007 and no valid taxes were authorized which were
       applicable to RSI's account wagering activities.

. . .

39.    Defendants conspired and agreed that DREW WRIGLEY would engage
       agents from the Federal Bureau of Investigation ("FBI") and the Internal
       Revenue Service ("IRS") to investigate what CICHY had falsely reported.

40.    On or about April 22, 2003, CICHY, BOWLINGER, DREW WRIGLEY
       and/or STENEHJEM provided or caused to be provided the aforementioned
       false information – that RSI was not properly licensed, that RSI had failed to
       pay excise taxes, and that RSI violated Racing Commission regulations – to
       the FBI.  Based upon that information, on or about April 28, 2003, search
       warrants were obtained to search RSI facilities including the 1318 Office.

41.    On or about April 28, 2003 RSI facilities including the 1318 Office were
       raided by agents from various state and federal agencies including the FBI,

the IRS, and the Office of the Attorney General of the State of North Dakota searching for evidence of alleged illegal gambling activities. During the raid, numerous items of RSI property, including computers, bet-entry or "tote" machines, files, and other business equipment, were confiscated and held by the various governmental entities involved. No further account wagering activities were conducted at the 1318 Office after the raid. However, the same account wagering activities continued at RSI's main office facility in Fargo, North Dakota.

42.    Over the next several months, Defendants reviewed information confiscated from RSI and caused numerous RSI personnel and other witnesses to be interviewed. As the investigation proceeded under advise and direction of Defendants, Defendants sought to find evidence that the account wagering activities conducted at the 1318 Office were not legal under state law as a basis for their flawed theory that the activities violated federal gambling and money laundering statutes.

. . .

49.    On or about December 10, 2003, DREW WRIGLEY caused the United States of America to [commence] a federal criminal action titled *USA v. RSI, et al*, United States District Court for the District of North Dakota Case No. 3:03-cr-00112 ("*USA v. RSI*"), against RSI, BALA and RSI Vice President, Raymundo Diaz alleging numerous counts of illegal gambling, conspiracy, and money laundering arising from the account wagering activities conducted at the 1318 Office from October of 2002 through April of 2003.

. . .

54.    Furthermore, STENEHJEM and DREW WRIGLEY instructed the receiver not to hire legal counsel to defend RSI in the criminal proceedings. STENEHJEM, DREW WRIGLEY, and/or other Defendants continued to oppose the use of RSI resources to retain legal counsel in the ongoing criminal and bankruptcy proceedings. Ultimately, Defendants succeeded in causing the corporate entity, RSI, to become unable to obtain adequate representation in all of the legal proceedings it was a party to.

55.    Trial in the *USA v. RSI* matter commenced on January 18, 2005. Prior to trial, BALA's and RSI's co-defendant Raymundo Diaz entered into a plea agreement with DREW WRIGLEY designed to end Diaz's prosecution and to avoid a prison sentence. DREW WRIGLEY also entered [into] a similar plea agreement with RSI Chief Financial Officer, Gary Storm, who had not

as of the trial date been formally charged.  Both Diaz and Storm agreed to enter guilty pleas to federal criminal charges in exchange for their cooperation in the prosecution against BALA and RSI.

56.     BALA continued to profess innocence.  RSI was inadequately represented due to Defendants' actions.  Following trial, a jury returned guilty verdicts against both on all 12 charges sought by DREW WRIGLEY in *USA v. RSI*. BALA was sentenced to serve twenty seven months in a federal prison for the offenses and forfeitures exceeding $99 million were imposed against RSI and BALA.


. . .


58.     In or about December of 2005, BOWLINGER was presented a certificate and was publicly recognized by DREW WRIGLEY because the convictions of BALA and RSI could not have been obtained but for the evidence provided by Bowlinger during the investigatory and later stages of the federal prosecution.  Defendants knew or should have known that significant portions of the evidence provided by BOWLINGER was false and/or misleading.

59.     BALA and RSI appealed the federal convictions.  BALA's request to stay the sentence pending outcome of the appeal to enable her to continue her care of a disabled family member was opposed by DREW WRIGLEY.  Accordingly, BALA was ordered to report to the Federal Prison Camp in Pekin, Illinois on September 30, 2005 to commence her prison sentence.  BALA remained there until March 7, 2007 – the day after the convictions were overturned by *United States v. Bala*, *supra*, 489 F.3d 334 (8th Cir. 2007), – for a total of 523 days of imprisonment . . . .

60.     Following the reversal of the BALA and RSI conviction, both Diaz and Storm obtained expungements of their criminal charges and convictions with the consent and stipulation of DREW WRIGLEY.

61.     Notwithstanding his consent to the expungements of the Diaz and Storm charges and convictions, DREW WRIGLEY opposed and continues to oppose the granting of certificates of innocence for BALA and RSI to enable BALA to obtain the nominal compensation provided by federal law in 28 U.S.C. § 2513 for her unjust imprisonment.

See Docket No. 9.

33

The Plaintiffs allege that former United States Attorney Drew Wrigley caused the Plaintiffs to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and/or laws of the United States in violation of <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), including rights against unreasonable searches and seizures and arrest without probable cause in violation of the Fourth Amendment, rights against malicious prosecution without probable cause in violation of the Fourth and Fourteenth Amendments, rights to substantive due process secured by the Fifth and Fourteenth Amendments, rights against taking without just compensation secured by the Fifth and Fourteenth Amendments, right to counsel secured by the Sixth and Fourteenth Amendments, and rights to due process in violation of the Fourteenth Amendment for securing unlawful taxes.

In <u>Bivens</u>, the United States Supreme Court recognized an implied private right of action for damages against federal officers alleged to have violated a citizen's Fourth Amendment rights. The Supreme Court later extended the holding in <u>Bivens</u> to encompass violations of the Fifth Amendment, <u>Davis v. Passman</u>, 442 U.S. 228, 248-49 (1979), and the Eighth Amendment, <u>Carlson v. Green</u>, 446 U.S. 14, 32-33 (1980).

**1)**   <u>**FALSE EVIDENCE AND CIVIL CONSPIRACY**</u>

In paragraphs 36 and 39 of the amended complaint, the Plaintiffs make two allegations of wrongdoing on behalf of former United States Attorney Wrigley. In paragraph 36, the Plaintiffs allege that Wrigley knowingly provided false evidence which he adopted and ratified to the effect that RSI was not licensed to conduct account wagering, that RSI had failed to pay lawfully imposed excise taxes, and that the account wagering activities of RSI were conducted in violation of then-

34

existing Racing Commission regulations.  See Docket No. 9, ¶ 36.  In paragraph 39, the Plaintiffs

allege that Wrigley conspired with the other Defendants and agreed that he would engage agents

from the Federal Bureau of Investigation (FBI) and the Internal Revenue Service (IRS) to investigate

the false evidence.  See Docket No. 9, ¶ 39.

The Plaintiffs provide the following information in support of their allegations against former

United States Attorney Wrigley:

> Defendant Bowlinger then gave false evidence, agreed to, adopted and
> ratified by the other Defendants, that RSI was conducting account wagering in
> violation of Racing Commission regulations then in existence.  That assertion was
> patently false because the Racing Commission, as an administrative agency, is not
> authorized to make rules except pursuant to the statutory rulemaking procedure set
> forth in the North Dakota Administrative Practices Act (APA).  The APA requires,
> among other things, that to be effective, administrative rules must be published in the
> North Dakota Administrative Code.  The published Racing Commission rules then
> in effect were adopted in 1990 and made no mention of or provision for account
> wagering because account wagering did not become legal until Bala had obtained
> legislative authorization for it in 2001.

> Bowlinger, Howard Wrigley and Stenehjem knew that evidence was false
> because the Racing Commission's minutes from 2002 indicate that Bowlinger on
> numerous occasions had informed the Racing Commission that rules governing
> account wagering recently authorized by the legislature had not yet been drafted and
> that he and the Attorney General's office would draft such regulations.  In fact
> regulations governing account wagering were never adopted until 2007.

> All of the Defendants met and agreed that Defendant Drew Wrigley should
> rely upon Cichy's and Bowlinger's knowingly false evidence.  Defendant Drew
> Wrigley agreed and adopted and ratified the knowingly false evidence to further
> investigate and develop a theory that a federal crime had been committed.  The State
> Defendants then backed off agreeing with Defendant Drew Wrigley to defer to his
> federal investigation.

> Defendant Drew Wrigley, using knowingly false evidence which would have
> been easily debunked had he properly reviewed the law, the Racing Commission
> regulations and public records, developed the ill-fated federal crime theory.  All of
> the Defendants conferred at one stage or another, and agreed to the course of action
> Defendant Drew [Wrigley] was pursuing with the specific and malicious intent of
> bringing down Bala and RSI.

See Docket No. 21.

The Plaintiffs provide vague, general, and conclusory allegations that former United States Attorney Wrigley should have known that the evidence provided to him by the other Defendants, namely that RSI was conducting racing operations in violation of the North Dakota Racing Commission's regulations, was false because the North Dakota Racing Commission had not enacted administrative rules for account wagering.  The Plaintiffs did not allege on appeal to the Eighth Circuit Court of Appeals that the evidence provided by former RSI employee Michael Cichy was false or fabricated.  Instead, the Plaintiffs argued that the evidence was insufficient to sustain a conviction on all counts because RSI's gambling operation was a legal parimutuel wagering business "that at worst violated the [Racing] Commission's licensing regulations." United States v. Bala, 489 F.3d 334, 337 (8th Cir. 2007); accord Brief of Petitioner-Appellant, United States v. Bala, Nos. 05-3688 and 05-3691 (8th Cir. Apr. 5, 2006); Brief of Petitioner-Appellant, United States v. Bala, Nos. 05-3688 and 05-3691 (8th Cir. Mar. 31, 2006).  In United States v. Bala, 489 F.3d 334 (8th Cir. 2007), the Eighth Circuit Court of Appeals reversed the Plaintiffs' convictions on all counts on the grounds that the evidence was insufficient to convict.  The Eighth Circuit's reversal of the convictions does not evidence that the Defendants fabricated false evidence against the Plaintiffs or that the Plaintiffs were innocent of the crimes charged.  The Eighth Circuit clarified in a later decision that "[i]n no way was our decision premised on Bala's or RSI's actual innocence." United States v. Racing Services, Inc., 580 F.3d 710, 714 (8th Cir. 2009).

More important, the Plaintiffs have failed to provide sufficient facts supporting a civil conspiracy claim.  The Plaintiffs allege that former United States Attorney Wrigley conspired with the other Defendants to engage agents from the FBI and IRS to investigate the allegations made by

36

Cichy.  The Plaintiffs have failed to provide any facts or background information as to the time and place of a meeting, substance of discussion, reference to witness testimony, or any other specific information to demonstrate the existence of an agreement or a meeting of the minds between former United States Attorney Wrigley and the other Defendants.  The mere allegation that former United States Attorney Wrigley met with law enforcement officials, state authorities, and the IRS does not suggest plausible illicit activity.  Cooperation between state and federal law authorities is to be encouraged.

The Plaintiffs also allege that "[t]he reactions of all Defendants (resulting in the ultimate destruction of RSI and imprisonment of Bala) was wildly disproportionate to the need for the Racing Commission to simply deal with the newly authorized account wagering.  There was no reason for Defendant Drew Wrigley to get involved other than the fact that his father chaired the Racing Commission."  See Docket No. 21.  The Plaintiffs have failed to allege any facts which suggest that former United States Attorney Wrigley entered into any alleged conspiracy because his father was the Chair of the North Dakota Racing Commission.

In reviewing a motion to dismiss, the Court must accept as true all allegations contained in the complaint.  This requirement does not extend to legal conclusions.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. at 1949.  The Supreme Court stated,

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Id. (internal citations omitted).  The plausibility requirement is not akin to a probability standard, but it requires more than a sheer possibility that the defendant acted unlawfully.

The Plaintiffs have failed to set forth any facts or evidence to demonstrate that former United States Attorney Wrigley knew that the evidence Cichy provided was false or fabricated.  The Plaintiffs have failed to provide any information as to the time, location, and substance of discussion during which former United States Attorney Wrigley allegedly conspired with the other Defendants and agreed to engage agents from the FBI and IRS to investigate Cichy's false allegations that RSI was operating an illegal parimutuel gambling operation.  By failing to provide any facts in support of their theories, the Plaintiffs' allegations in paragraphs 36 and 39 of the amended complaint are nothing more than legal conclusions couched as vague or conclusory factual allegations.  The Plaintiffs cannot succeed on a motion to dismiss by making, as here, naked assertions devoid of further factual enhancement.  See Iqbal, 129 S. Ct. at 1949.  The Court finds that the Plaintiffs have failed to satisfy the minimum pleading requirements set forth in Iqbal and Rule 8 of the Federal Rules of Civil Procedure.

### 2)      INSTRUCTING THE RECEIVER

The Plaintiffs contend that former United States Attorney Wrigley instructed the bankruptcy court-appointed receiver not to hire legal counsel for RSI and to oppose the use of RSI resources to retain counsel in the criminal and bankruptcy proceedings.  See Docket No. 9, ¶ 54.  The Plaintiffs allege that the "Defendants succeeded in causing the corporate entity, RSI, to become unable to obtain adequate representation in all of the legal proceedings it was a party to."  See Docket No. 9, ¶ 54.  The record clearly reveals that RSI was in fact represented by competent and experienced

defense counsel at trial and on appeal.[3]  The Plaintiffs' allegations are unclear as to how former United States Attorney Wrigley violated their Sixth Amendment rights.  The evidence establishes that the Plaintiffs were represented jointly at trial by attorney Mark Beauchene.  The Plaintiffs have failed to provide any evidence that Drew Wrigley prevented the Plaintiffs from retaining separate counsel.  The Plaintiffs' allegations of a Sixth Amendment violation of a right to counsel are nothing more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  Iqbal, 129 S. Ct. at 1949.

Pursuant to Rule 44(c)(2) of the Federal Rules of Criminal Procedure, the court bears the responsibility in cases of joint representation to protect each defendant's right to counsel.  The evidence reveals that the district court gave strict jury instructions which required the jury to consider each defendant separately for purposes of criminal liability.  The Plaintiffs have failed to provide any evidence that former United States Attorney Wrigley acted in any way to mislead the court of a possible conflict of interest arising from Mark Beauchene representing both Bala and RSI in the criminal proceedings.  The Plaintiffs have also failed to provide any facts as to how former United States Attorney Wrigley's participation in the bankruptcy proceedings affected RSI's ability to obtain legal representation.  The Plaintiffs must provide more than vague legal conclusions to satisfy the pleading requirements under Rule 8 of the Federal Rules of Civil Procedure.  The Court finds that the Plaintiffs have failed to satisfy Rule 8 of the Federal Rules of Civil Procedure and Iqbal.

---

[3] RSI was represented at trial by attorney Mark A. Beauchene.  See Case No. 3:03-cr-112.  RSI was represented on appeal by attorney Gene Doeling.  See United States v. Bala, 489 F.3d 334 (8th Cir. 2007).

### 3)   **MALICIOUS PROSECUTION**

The Plaintiffs also argue that former United States Attorney Wrigley violated their Fourth and Fourteenth Amendment rights to be free from malicious prosecution because "a reasonable government official would have known that the criminal charges pursued against BALA and RSI were based upon specious legal theories which lacked probable cause." See Docket No. 9, ¶ 68. Bivens allows a cause of action for constitutional violations by federal officers. Nebraska Beef, Ltd. v. Greening, 398 F.3d 1080, 1081 n.1 (8th Cir. 2005). "The Constitution does not mention malicious prosecution . . . ." Kurtz v. City of Shrewsbury, 245 F.3d 753, 758 (8th Cir. 2001). The Eighth Circuit has clarified that "malicious prosecution . . . is not punishable under [42 U.S.C. § 1983], or Bivens, because it does not allege a constitutional injury." Gordon v. Hansen, 168 F.3d 1109, 1114 (8th Cir. 1999). The Court finds that the Plaintiffs have failed to state a claim upon which relief can be granted on the claim of malicious prosecution.

### 4)   **PRE-INDICTMENT ACTIONS OF DEFENDANTS**

The Plaintiffs allege that former United States Attorney Wrigley met with Bowlinger and Attorney General Stenehjem to discuss how to handle Cichy's allegations that RSI was operating an illegal parimutuel gambling business; he conspired with the other Defendants to engage agents from the FBI and IRS to investigate Cichy's allegations; he conveyed Cichy's allegations to the FBI on April 22, 2003, which resulted in the issuance of search warrants on April 28, 2003; and he reviewed information confiscated from RSI and interviewed RSI staff. See Docket No. 9, ¶¶ 35, 39, 40, and 42.

a)      **INVESTIGATION**

The Plaintiffs contend that the pre-indictment actions of former United States Attorney Wrigley, Attorney General Stenehjem, Bowlinger, and Howard Wrigley violated their rights because the information was based upon fabricated evidence.  <u>See</u> Docket No. 9, ¶ 36.  The Court has determined that the Plaintiffs have failed to satisfy Rule 8 of the Federal Rules of Civil Procedure on the claim that former United States Attorney Wrigley adopted and ratified false evidence.  The Plaintiffs have not explained how Drew Wrigley's conduct of meeting with state and federal law enforcement authorities violated their federal constitutional or statutory rights.   There is no constitutional right to be free of an investigation.  <u>United States v. Crump</u>, 934 F.2d 947, 957 (8th Cir. 1991) (citing <u>United States v. Jacobson</u>, 916 F.2d 467, 469 (8th Cir. 1990), *overruled on other grounds by* <u>Jacobson v. United States</u>, 503 U.S. 540 (1992)); <u>United States v. Trayer</u>, 898 F.2d 805, 808 (D.C. Cir. 1990).

b)      **TAKING WITHOUT JUST COMPENSATION**

The Plaintiffs allege that former United States Attorney Wrigley, Attorney General Stenehjem, Bowlinger, and Howard Wrigley violated their rights against "taking without just compensation" in violation of the Fifth and Fourteenth Amendments because a reasonable government official would have known that the Plaintiffs' property and property interests were taken by the State for unlawful reasons and without compensation.  <u>See</u> Docket No. 9, ¶ 68.  The Plaintiffs have failed to allege or provide any facts in support of this vague and conclusory allegation.  The Court will not speculate as to the basis for the claim.  The Plaintiffs' allegations of a taking without

just compensation are insufficient to satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure and Iqbal.

c)      UNREASONABLE SEARCHES

The Plaintiffs allege that former United States Attorney Wrigley, Attorney General Stenehjem, Bowlinger, and Howard Wrigley violated their Fourth and Fourteenth Amendment rights against unreasonable searches and seizures and arrest without probable cause because a reasonable government official would have known that the searches of RSI facilities, seizures of the Plaintiffs' property, and indictments and charges were unlawful. See Docket No. 9, ¶ 68.

The Plaintiffs have not specified how the Defendants violated their Fourth and Fourteenth Amendment rights against unreasonable searches and seizures. The only possible pre-indictment action that could state a Fourth Amendment claim is the application for a search and seizure warrant. The Plaintiffs have not alleged that Attorney General Stenehjem, Bowlinger, or Howard Wrigley applied for a search and seizure warrant in state district court. Nor have the Plaintiffs alleged that former United States Attorney Wrigley applied for a search and seizure warrant in federal district court. The evidence establishes that a federal law enforcement officer applied for a search warrant in federal district court. See Case No. 3:03-mj-043, Docket No. 1. The United States Supreme Court has stated that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 129 S. Ct. at 1948. The Eighth Circuit has reiterated this sentiment. See Buford v. Runyon, 160 F.3d 1199, 1203 n.7 (8th Cir. 1998) (stating that there is no respondeat superior liability in Bivens actions). Instead, government officials are personally liable for their personal acts only. Estate of Rosenberg by Rosenberg v.

42

Crandell, 56 F.3d 35, 37 (8th Cir. 1995).  Therefore, former United States Attorney Wrigley cannot be held personally liable for the actions of federal investigators who submitted the application for a search and seizure warrant.  The Plaintiffs have failed to provide sufficient facts to state a claim that Drew Wrigley violated their Fourth Amendment rights to be free from unreasonable searches and seizures.

The Court further finds that even if the Plaintiffs had alleged sufficient facts to state a Fourth Amendment cause of action against former United States Attorney Wrigley, he would be protected by either qualified immunity or absolute immunity.  In Skokos v. Rhoades, 440 F.3d 957 (8th Cir. 2006), a prosecutor brought an action in state court against business owners who owned countertop gaming machines.  The prosecutor contacted local police to investigate whether the gaming machines violated state law.  The police obtained search warrants and seized the gaming machines. The defendants brought an action against the city in state district court for declaratory, injunctive, and compensatory relief.  The state district court determined that the gaming machines were not illegal under state law, and the state supreme court affirmed.  The defendants then filed an action in federal district court against four police officers and the prosecutor under 42 U.S.C. § 1983.  The Eighth Circuit stated,

> Skokos and Chapman argue that the seizure of their countertop machines violated their fourth amendment rights.  Since [the prosecutor] was acting in an investigatory capacity in advising the police that the machines were illegal under Arkansas law, he is eligible only for qualified immunity, not absolute prosecutorial immunity.  Mr. Rhoades is entitled to qualified immunity if his legal opinion was reasonable when made.  Like a police officer, a prosecutor is "entitled to make a reasonable interpretation of the law he is obligated to enforce."

Skokos, 440 F.3d at 960 (internal citations omitted).  The Eighth Circuit determined that the prosecutor's interpretation of Arkansas law was reasonable because the Arkansas Supreme Court

had not ruled on the precise issue of whether the gaming machines were legal and, therefore, was entitled to qualified immunity.

"Qualified immunity protects state actors from civil liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Collins v. Bellinghausen, 153 F.3d 591, 595 (8th Cir. 1998) (quoting Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995)). "In other words, '[t]he qualified immunity doctrine shields state actors from personal liability when their actions, though unlawful, are nevertheless objectively reasonable in light of the clearly established law at the time of the events in question.'" Mueller v. Tinkham, 162 F.3d 999, 1002 (8th Cir. 1998) (quoting Rogers v. Carter, 133 F.3d 1114, 1119 (8th Cir. 1998)). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)). Under the objective reasonableness standard, the court may not consider the subjective intent of the government official. See Burk v. Beene, 948 F.2d 489, 494 (8th Cir. 1991) ("A defendant's good faith or bad faith is irrelevant to the qualified immunity inquiry."). In the context of a government official assisting in obtaining a search warrant, "'immunity will be lost only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" Walden v. Carmack, 156 F.3d 861, 869 (8th Cir. 1998) (quoting George v. City of St. Louis, 26 F.3d 55, 57 (8th Cir. 1994)).

Courts generally undergo a two-step analysis when determining whether a government official is entitled to qualified immunity: (1) whether the facts alleged establish that a government official violated the plaintiff's constitutional right; and (2) whether the right at issue was clearly

44

established at the time of the alleged conduct.  Pearson, 129 S. Ct. at 815-16.  Courts may consider this two-step process in either order.  Id. at 821, 822.

The Plaintiffs argue that former United States Attorney Wrigley knowingly provided false evidence which the Defendants adopted and ratified and which ultimately served as the basis for the issuance of the search and seizure warrant.  The Plaintiffs have failed to provide any facts to support the allegation that the evidence was fabricated or that false evidence was ratified.  The Plaintiffs also allege that Drew Wrigley used a "flawed theory" to prosecute them.  See Docket No. 9, ¶ 42.  It is clear and undisputed that qualified immunity extends to protect government officials from liability for committing an objectively reasonable mistake of law, mistake of fact, or mistake of law and fact.

In this case, a federal magistrate judge first found probable cause to issue a search and seizure warrant.  A jury empaneled in federal district court found sufficient evidence to convict the Plaintiffs of conducting and conspiring to conduct an illegal gambling business in violation of 18 U.S.C. §§ 1955 and 371; illegal transmission of wagering information in violation of 18 U.S.C. § 1084(a); eight counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i); and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  A federal district court judge denied the Plaintiffs' motion to dismiss the indictment. The Court finds, in its discretion, that even if former United States Attorney Wrigley made a mistake of law, a mistake of fact, or both in prosecuting the Plaintiffs in federal district court on any count, it was objectively reasonable for former United States Attorney Wrigley and the law enforcement officers who executed the warrant, to assume the legal basis on which the warrant was based was correct.

The Court notes that the Eighth Circuit Court of Appeals in <u>United States v. Bala</u>, 489 F.3d 334, 337 (8th Cir. 2007), said that the issue of whether RSI was conducting illegal gambling operations at the 1318 Office is "difficult and complex," "both factually and legally." The Eighth Circuit reversed the Plaintiffs' convictions on the basis of legal insufficiency of the evidence. <u>See</u> <u>United States v. Bala</u>, 489 F.3d 334 (8th Cir. 2007). However, the Eighth Circuit later clarified that its ruling was not a determination of RSI's or Bala's innocence. <u>See</u> <u>United States v. Racing Services, Inc.</u>, 580 F.3d 710, 714 (8th Cir. 2009) ("In no way was our decision premised on Bala's or RSI's actual innocence of either state or federal charges. Our decision was based on the insufficiency of the evidence to support the federal charges."). The Eighth Circuit noted the unique circumstances of the case, stating:

> In no prior § 1955 case have we dealt with an alleged violation where the core gambling activity was specifically authorized by state law but the manner in which defendant conducted that activity violated some aspect of state law. In this situation, we must identify those criminal violations of state law that turn a legal gambling business into an "illegal gambling business" that is itself a violation of state law.

<u>Bala</u>, 489 F.3d at 340. The Eighth Circuit did not cite to any North Dakota case law. The federal courts <u>and</u> the parties were required to interpret, as a matter of first impression, whether North Dakota's gambling laws were violated in this federal context.[4] The Court finds, in its discretion, that any alleged mistake of law, mistake of fact, or mistake of law and fact made by former United States Attorney Wrigley during the pre-indictment stages of the action was reasonable. Former United States Attorney Wrigley is clearly protected by qualified immunity for any allegations regarding his

---

[4] The Eighth Circuit in <u>United States v. Racing Services, Inc.</u>, 580 F.3d 710, 714 (8th Cir. 2009), noted that RSI and Susan Bala "collected and distributed $99,000,000 of parimutuel account wagers without paying one penny to charities, to the Racing Commission, or to the state treasurer, as North Dakota's gambling laws required." The Eighth Circuit also noted that it agreed with the district court's assessment that the Plaintiffs are not truly innocent of all state law offenses.

pre-indictment actions, including any participation in obtaining a search and seizure warrant and prosecuting the Plaintiffs based on the evidence obtained from the search and seizure.  See Skokos, 440 F.3d at 960.


### 5)   INDICTMENT AND POST-INDICTMENT ACTIONS

Former United States Attorney Wrigley argues that he is absolutely immune from suit regarding his post-indictment actions because such actions were made within the scope of his duties as a United States Attorney.  The Plaintiffs raise numerous allegations of wrongdoing by Drew Wrigley for conduct occurring at the indictment and post-indictment stages of the federal criminal action.  The Plaintiffs argue that Drew Wrigley (1) signed an indictment, after the true bill was returned by the grand jury which commenced a federal criminal action against the Plaintiffs; (2) entered into plea agreements with co-defendants Raymundo Diaz and RSI Chief Financial Officer Gary Storm; (3) sought to convict Bala on all charges even though she was inadequately represented at trial; (4) publicly thanked and presented a certificate to Paul Bowlinger for assisting in the convictions of the Plaintiffs; and (5) following the Eighth Circuit's reversal of the convictions against the Plaintiffs, consented to the expungements of the criminal charges and convictions of Raymundo Diaz and Gary Storm but did not consent to the expungements of the criminal charges and convictions of the Plaintiffs.  See Docket No. 9, ¶¶ 49, 55, 56, 58, and 61.

In Yaselli v. Goff, 12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927), the Second Circuit Court of Appeals held that a federal prosecutor enjoys absolute immunity for actions conducted in the performance of his duties as a prosecutor.  In Imbler v. Pachtman, 424 U.S. 409 (1976), the United States Supreme Court extended the principles of Yaselli to an action brought against a state

prosecutor under 42 U.S.C. § 1983.  The United States Supreme Court found that prosecutors enjoy absolute immunity for activities "intimately associated with the judicial phase of the criminal process."  Imbler, 424 U.S. at 430.  "The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grant jurors acting within the scope of their duties.  These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."  Id. at 422-23.  The Supreme Court stated two reasons for why prosecutors enjoy absolute immunity rather than qualified immunity for initiating a prosecution and presenting the state's case.  First, "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages."  Id. at 424-25.  Second, "affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system.  Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence."  Id. at 426.

The United States Supreme Court has considered whether various actions by prosecutors constitute conduct that is intimately associated with the judicial phase of the criminal process. In Burns v. Reed, 500 U.S. 478 (1991), the Supreme Court determined that a prosecutor's appearance at a probable cause hearing was protected by absolute immunity because the issuance of a search warrant is a judicial act, but the prosecutor was not protected by absolute immunity for giving legal advice to police.  When a prosecutor is conducting investigative work, he is protected by qualified

immunity.  See Buckley v. Fitzsimmons, 509 U.S. 259, 273, 274 (1993).  In Buckley, 509 U.S. at 276, the United States Supreme Court stated, "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial."  The United States Supreme Court stressed in Buckley that a prosecutor is entitled to absolute immunity when he acts as an advocate for the government.  "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."   Buckley, 509 U.S. at 274.

Apart from the public thank you given by former United States Attorney Wrigley to Paul Bowlinger, the other four allegations of wrongdoing against Wrigley constitute conduct that is intimately associated with his role as a United States Attorney.  The decision to indict, enter plea agreements, prosecute civil and criminal matters, and oppose post-trial relief are actions which clearly fall within the course of a United States Attorney's duties.  At the indictment and post-indictment stages of the action, the former United States Attorney had probable cause to  prosecute the Plaintiffs.  By this point, a search and seizure warrant had been issued by a federal magistrate judge and evidence from the 1318 Office had been confiscated by law enforcement officers.  Wrigley's interpretation of the law was the same as the Assistant United States Attorneys who prosecuted the case, the co-defendants who pled guilty to similar charges prior to trial along with their defense attorneys, and the federal magistrate judge and Article III judge who were involved in the pretrial, trial, and post-trial criminal proceedings.  The Court finds that the decisions of former United States Attorney Drew Wrigley to indict, enter into plea agreements, prosecute a criminal

49

action, and deny the Plaintiffs post-trial relief were made as an advocate for the federal government and are intimately associated with the judicial phase of the criminal process and, therefore, are protected by absolute immunity.

### E.    **MICHAEL CICHY**

The Plaintiffs allege that former RSI employee Michael Cichy conspired with the other Defendants to tortiously interfere with the Plaintiffs' business interests.  It is alleged that:

31.    In or about October of 2002, RSI began to conduct account wagering activities recently authorized by the State of North Dakota at its offices located at 1318 23rd Avenue South in Fargo, North Dakota ("1318 Office") and continued to do so until late April of 2003.

32.    In late March or early April of 2003, BALA became aware that CICHY was attempting to maneuver at least one of RSI's large betters away from RSI so that CICHY could get himself set up to conduct account wagering and/or other parimutuel wagering activities as a rival to RSI.

33.    Upon learning of CICHY's unauthorized and disloyal acts, BALA informed CICHY that his employment with RSI would be terminated.

34.    On or about April 8, 2003, CICHY retaliated against BALA and RSI by calling BOWLINGER, and telling him that the 1318 Office was operating without being licensed as an off-track betting simulcast site using the terms "rogue site" and "stealth site" to describe the location.

35.    BOWLINGER contacted the North Dakota Attorney General's office with the information supplied by CICHY.  Shortly thereafter, a meeting was arranged between BOWLINGER, STENEHJEM, and DREW WRIGLEY to determine how to address CICHY'S allegations.

36.    BOWLINGER and/or the other Defendants, knowingly provided false evidence which all of the Defendants and their respective investigators adopted and ratified to the effect that RSI was not licensed to conduct account wagering, that RSI had failed to pay lawfully imposed excise taxes, and that the account wagering activities of RSI were conducted in violation of then-existing Racing Commission regulations.  In fact, RSI was at all relevant times fully licensed to conduct account [wagering], there were no

regulations adopted pursuant to the requirements of North Dakota law, and in particular in compliance with N.D.C.C. Chapter 28-32 governing account wagering until 2007 and no valid taxes were authorized which were applicable to RSI's account wagering activities.

. . .

40.     On or about April 22, 2003, CICHY, BOWLINGER, DREW WRIGLEY and/or STENEHJEM provided or caused to be provided the aforementioned false information – that RSI was not properly licensed, that RSI had failed to pay excise taxes, and that RSI violated Racing Commission regulations – to the FBI.  Based upon that information, on or about April 28, 2003, search warrants were obtained to search RSI facilities including the 1318 Office.

. . .

51.     The Racing Commission ordinarily held an annual meeting in November of each year to, among other things, award licenses to various entities involved in parimutuel wagering.  From 1993 through 2002, RSI had been licensed as the sole simulcast service provider in North Dakota by the Racing Commission each November.  However, in late 2003, Defendants conspired and agreed to cause the Racing Commission to postpone the annual meeting and the awarding of licenses until after the ill-fated and specious criminal proceedings against BALA and RSI were commenced.  Accordingly, on or about December 22, 2003, the Racing Commission held its annual meeting rejecting RSI's request for renewal of its simulcast service provider license because of the pending false criminal charges.  Instead, the sole simulcast service provider license was awarded to an entity known as Lien Games, Inc. where CICHY was employed at the time.  CICHY and one or more of the other Defendants, conspired to maneuver the license away from RSI to Lien Games, Inc., thereby eliminating any opportunity RSI would have for continued business.

. . .

72.     Defendant CICHY conspired with the other defendants named herein to tortiously interfere with Plaintiffs' business interests through his wrongful and/or malicious assertions to state and federal authorities that Plaintiffs and RSI were engaged in illegal gambling activities.

See Docket No. 9.

The Plaintiffs contend that Cichy conspired with the other Defendants to tortiously interfere with the Plaintiffs' business interests through wrongful and/or malicious statements to state and federal authorities that RSI was involved in illegal gambling operations in violation of 42 U.S.C. § 1983 and North Dakota tort law. Cichy argues that he is a private citizen and not a state actor and cannot be held liable under 42 U.S.C. § 1983. Cichy also argues that he is not liable under North Dakota tort law because he is protected by the whistleblower statute, N.D.C.C. § 34-01-20.

### 1)   42 U.S.C. § 1983

The Plaintiffs allege that former RSI employee Cichy conspired with the other Defendants to tortiously interfere with the Plaintiffs' business interests in violation of 42 U.S.C. § 1983. See Docket No. 9, ¶ 72. 42 U.S.C. § 1983 establishes a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage" deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983 applies only to state actors. Carlson v. Roetzel & Andress, 552 F.3d 648, 650 (8th Cir. 2008). "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" Id. (quoting Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc., 509 F.3d 406, 421 (8th Cir. 2007)). However, a private citizen may be liable under 42 U.S.C. § 1983 "when the private actor 'is a willful participant in joint activity with the State or its agents' in denying a plaintiff's constitutional rights." Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970)). "[A]n otherwise private person acts 'under color of' state law when

52

engaged in a conspiracy with state officials to deprive another of federal rights." Tower v. Glover, 467 U.S. 914, 920 (1984) (citing Dennis v. Sparks, 449 U.S. 24, 27-28 (1980)).

To prove a claim of conspiracy under 42 U.S.C. § 1983, a plaintiff must demonstrate: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). In addition, the plaintiff is required to demonstrate a deprivation of a constitutional right. Id. The Eighth Circuit requires that "a plaintiff seeking to hold a private party liable under § 1983 must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor." Mershon v. Beasley, 994 F.2d 449, 451 (8th Cir. 1993).

The United States Supreme Court has stated that "'[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment.'" Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) (quoting United States v. Price, 383 U.S. 787, 794 n.7 (1966)). The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." The Fourteenth Amendment does not prohibit private conduct and, therefore, action inhibited by the Fourteenth Amendment must be attributable to the state. Blum v. Yaretsky, 457 U.S. 991 (1982). If the actions of Cichy are not state actions, then the Court's inquiry ends.

From October 2002 through April 2003, Cichy was the Simulcast Coordinator and Lead Race Control Manager for RSI. It is alleged that in late March or early April 2003, Bala became aware that Cichy was attempting to steal one of RSI's clients for the purpose of establishing his own parimutuel wagering corporation and ultimately fired Cichy. See Docket No. 9, ¶¶ 32 and 33. Cichy

53

allegedly responded to the firing by falsely reporting to Paul Bowlinger, then Director of Racing for

the North Dakota Racing Commission, that RSI was running an illegal parimutuel gambling

operation.  See Docket No. 9, ¶ 34  The Plaintiffs contend that they have sufficiently alleged a

meeting of the minds between Cichy and the state Defendants:

> In the spring of 2003 [Cichy] planned to maneuver a large better away from RSI so he could get himself set up in account wagering.  When Plaintiff Bala foiled that plan, Cichy retaliated by going [to] Defendant Bowlinger with the false information that RSI was operating an unlicensed simulcast site.  Had the other Defendants at that point adequately looked into the parimutuel activity being conducted at the site Cichy reported, they would have determined that licensed account wagering was being conducted there.  They did not.  Instead, they endorsed and adopted Cichy's false assertions and enhanced them with Bowlinger's false assertions concerning the existence of account wagering regulations.
>
> As the [First Amended Complaint] alleges, Cichy continued to work with the other Defendants to establish that his assertions would be believed.  He provided specific information for the search warrant.  He also participated in the termination of RSI's service provider license so that it could be transferred to him.
>
> The [First Amended Complaint] adequately alleges or reasonably infers that Cichy knowingly and willfully participated in a joint endeavor or a conspiracy to destroy Plaintiffs and RSI.  While each defendant may have had his own individual ultimate goal (Cichy's being to wrest the service provider license away from RSI and eliminate RSI as a competitor), there was clearly a meeting of the minds as to common means of accomplishing the respective goals.  All agreed to [use] fabricated evidence to bring down RSI and Bala.

See Docket No. 26.

The Court finds that the Plaintiffs rely on mere speculation to support the allegation that a

conspiracy existed between Cichy and the other Defendants to ruin the gambling success of RSI.

Cichy reported the alleged illegal conduct of RSI to Paul Bowlinger.  Bowlinger, as the Director of

Racing, had the responsibility to contact the North Dakota Attorney General's office regarding

Cichy's allegations.  See N.D.C.C. § 53-06.2-03 (indicating that the director of racing for the North

Dakota Racing Commission "is the executive officer of the commission and shall enforce the rules

and orders of the commission"). The fact that Cichy, Bowlinger, Attorney General Stenehjem, and former United States Attorney Drew Wrigley met to discuss Cichy's allegations and determine the legal course of action to pursue does not support an inference that Cichy had conspired with the other Defendants to ruin RSI. The Plaintiffs have failed to provide any facts or evidence to support their theory that the Defendants agreed to initiate federal and state actions against RSI and Susan Bala knowing that RSI was operating a legal parimutuel gambling operation.

A conspiracy is not presumed from the mere fact that it is alleged in the amended complaint. Allegations must at least include that "the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding" and provide some facts suggesting a meeting of the minds.  Smith v. Bacon, 699 F.2d 434, 436 (8th Cir. 1983).  The Plaintiffs' allegations are merely vague and conclusory in nature and unsupported by any facts. The Plaintiffs rely on mere speculation that the Defendants were involved in a conspiracy to shut down RSI's gambling operations. The Plaintiffs allege that Cichy fabricated stories about the illegality of RSI's gambling operations in an attempt to shut down RSI and create his own parimutuel gambling operation. Even if this theory were correct, the Plaintiffs have failed to provide any facts to establish why the other Defendants, namely Bowlinger, Howard Wrigley, former United States Attorney Drew Wrigley, and Attorney General Stenehjem, also desired to ruin RSI.  Without providing any evidence to establish that Cichy's desire to ruin RSI amounted to state action, this claim fails.  The Court finds that the Plaintiffs have failed to present any evidence that the Defendants conspired to ruin RSI by providing knowingly false statements to federal and state authorities. The Plaintiffs have failed to allege a sufficient claim under 42 U.S.C. § 1983 as to Michael Cichy to satisfy Rule 8 of the Federal Rules of Civil Procedure and Iqbal.

2)      **TORTIOUS INTERFERENCE**

The Plaintiffs also allege that Cichy tortiously interfered with their prospective business advantage.  "[I]n order to recover for wrongful interference with business, the plaintiff must prove the defendant's conduct was independently tortious or otherwise unlawful."  Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc., 628 N.W.2d 707, 719 (N.D. 2001).  By independently tortious, the North Dakota Supreme Court means that a plaintiff must be able to demonstrate that the defendant's conduct would be actionable under a recognized tort.  Id. at 720.  To prevail on a claim for unlawful interference with business, a plaintiff must prove:  "'(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.'"  Smith Enterprises, Inc. v. In-Touch Phone Cards, Inc., 685 N.W.2d 741, 747 (N.D. 2004) (quoting Trade 'N Post, L.L.C., 628 N.W.2d at 717).  The parties do not dispute elements (1), (2), and (5).  Cichy contests the Plaintiffs' ability to establish element (3), that he committed an independently tortious or otherwise unlawful act of interference by the interferer, and element (4), proof that he caused the harm sustained.  The Plaintiffs allege that the tort consists of Cichy violating his fiduciary duties to RSI:

> Cichy knew that RSI had obtained legal authority to conduct account wagering.  He knew that no separate license was needed for account wagering.  He also knew that the facility he referred to as a "rogue site" was not a simulcast site – he was the RSI Simulcast Coordinator.  It is incredible that Cichy could in good faith state he honestly believed RSI was operating an unlicensed site.  Moreover, his actions were motivated by an intent to retaliate against Plaintiffs for disciplining him over his prior disloyal acts.

See Docket No. 26 (emphasis in original).

56

The Plaintiffs argue that Cichy violated element (3) by committing an otherwise unlawful act, namely violating N.D.C.C. §§ 12.1-11-02(1)[5] and 12.1-11-03(1)[6] by providing knowingly false and misleading information to law enforcement officials and to a federal magistrate judge under oath. The allegation that Cichy lied under oath to a federal magistrate judge is a new allegation that was not previously raised in the amended complaint. The Plaintiffs have failed to provide any facts, such as statements made by Cichy, to suggest that Cichy knew the evidence he provided to Bowlinger and law enforcement authorities was fabricated. There is no indication from the record that the Plaintiffs on appeal to the Eighth Circuit argued that the underlying information provided by Cichy was false. See United States v. Bala, 489 F.3d 334 (8th Cir. 2007). Instead, the Plaintiffs argued before the Eighth Circuit that "the evidence was insufficient to sustain their convictions on all counts because it established that RSI's account wagering operation at 1318 was a legal parimutuel wagering business that at worst violated the Commission's licensing regulations." Id. at 337. The Court finds that the Plaintiffs have failed to allege any facts to suggest that Cichy was aware that the statements or information he allegedly provided to the other Defendants and law enforcement officials were false.

The Plaintiffs contend that Cichy falsely informed law enforcement officers that the 1318 Office was a "rogue site" and "stealth site." See Docket No. 9, ¶ 34. Statements of opinion, by their

---

[5] N.D.C.C. § 12.1-11-02(1) provides:

A person is guilty of a class A misdemeanor if, in an official proceeding, he makes a false statement, whether or not material, under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, if he does not believe the statement to be true.

[6] N.D.C.C. § 12.1-11-03(1) provides:

A person is guilty of a class A misdemeanor if that person [g]ives false information or a false report to a law enforcement officer which that person knows to be false, and the information or report may . . . materially mislead a law enforcement officer.

very nature, are not facts and, therefore, cannot be false.  Accordingly, Cichy's opinions about the 1318 Office are not actionable under N.D.C.C. §§ 12.1-11-02(1) or 12.1-11-03(1).

The Plaintiffs argue that Cichy, as a former employee of RSI, owed a fiduciary duty to them. A prerequisite to a fiduciary duty is the presence of a fiduciary relationship.  L.C. v. R.P., 563 N.W.2d 799, 801 (N.D. 1997).  A fiduciary relationship under North Dakota law is "'something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance . . . ordinarily exercise[d].'"  Id. (quoting Asleson v. W. Branch Land Co., 311 N.W.2d 533, 539 (N.D. 1981)).  "A fiduciary relationship develops when someone is under a duty to act for, or to give advice to, another person upon matters within the scope of the relationship."  Matter of Estate v. Lutz, 563 N.W.2d 90, 98 (N.D. 1997).  A fiduciary relationship generally does not arise from equal relationships between the parties.  Id.  "In creating a fiduciary relationship, the superior party must assume a duty to act in the dependent party's best interest."  L.C., 563 N.W.2d at 802.

Cichy argues that even if he owed a fiduciary duty to the Plaintiffs, he was protected by North Dakota's whistleblower statute, N.D.C.C. § 34-01-20.  "Section 34-01-20(1), N.D.C.C., prohibits an employer from discharging or penalizing an employee for reporting the violation or suspected violation of a law, ordinance, regulation, or rule to an employer, a governmental body, or a law enforcement official."  Vandall v. Trinity Hospitals, 676 N.W.2d 88, 90 (N.D. 2004).  "The clear purpose of N.D.C.C. § 34-01-20 is to protect employees who expose illegalities in the workplace, and we are not persuaded N.D.C.C. § 34-01-20 was intended to protect an employee who acts for a purpose other than exposing an illegality."  Dahlberg v. Lutheran Soc. Services of North Dakota, 625 N.W.2d 241, 254-55 (N.D. 2001).  There is no evidence to support Cichy's allegation

58

that the whistleblower statute was intended to prevent an employer from filing a lawsuit against an employee for reporting an alleged violation of state law. The Court finds that the North Dakota whistleblower statute, N.D.C.C. § 34-01-20, is inapplicable to the claims filed against Cichy.

Even if Cichy owed RSI a fiduciary duty, the Plaintiffs have failed to present any evidence that the information provided by Cichy to law enforcement was false. The Eighth Circuit clearly stated that this case presented difficult and complex issues, both factually and legally. The Eighth Circuit reversed the Plaintiffs' convictions on insufficiency of evidence grounds. The Eighth Circuit also determined that the Plaintiffs were not innocent parties. See United States v. Racing Services, Inc., 580 F.3d 710, 714 (8th Cir. 2009) (affirming the decision of the district court that "RSI and Bala are not truly innocent of all state law offenses"). Common sense dictates that there is no fiduciary duty which would prohibit an employee from reporting good faith, suspected violations of law by his employer to law enforcement officials. Even if Cichy reported the suspected violations to law enforcement officers in retaliation for being fired, the Plaintiffs have failed to present any facts to suggest that Cichy did not in good faith believe that the Plaintiffs were violating North Dakota gambling laws. It would be incongruous for this Court to find a tortious interference claim for Cichy reporting alleged violations of North Dakota gambling laws when the Eighth Circuit has concluded that the Plaintiffs are not truly innocent parties.

### F.   **ALL DEFENDANTS**

The Plaintiffs allege that the North Dakota Racing Commission failed to renew RSI's simulcast provider license on December 22, 2003, and instead awarded a license to Lien Games, Inc., where former RSI employee Michael Cichy was employed at the time. See Docket No. 9, ¶

51.   The Plaintiffs seek to hold the Defendants liable for the Racing Commission's decision.   The Plaintiffs have not provided, nor has the Court found, any case law to support the assertion that the Racing Commission's decision not to renew RSI's simulcast provider license violated the Plaintiffs' federal constitutional or statutory rights.

The Plaintiffs have failed to provide any evidence that Howard Wrigley, Paul Bowlinger, or Attorney General Wayne Stenehjem were responsible for the Racing Commission's decision.   The evidence clearly establishes that Howard Wrigley was not a member of the Racing Commission on December 22, 2003, the date that the Racing Commission refused to renew RSI's simulcast provider license.   On October 8, 2003, Howard Wrigley resigned from his position as the Chair of the Racing Commission because of a perceived conflict of interest.   Bowlinger was the Director of Racing for the Racing Commission who was not a voting member and, therefore, was not responsible for the Racing Commission's decision.   Attorney General Stenehjem was not a member, staff, or employee of the Racing Commission.

The Defendants contend that the North Dakota Racing Commission is entitled to absolute immunity for its actions in refusing to renew RSI's simulcast service provider license.   "Persons who perform quasi-judicial functions are entitled to absolute immunity."   Dunham v. Wadley, 195 F.3d 1007, 1010 (8th Cir. 1999).   In Dunham, an individual who had been practicing veterinary medicine without a license sued members of the Arkansas Veterinary Medical Examining Board for enjoining her from practicing veterinary medicine in Arkansas.   The veterinary board consisted of five members who were appointed by the governor.   The board conducted investigations into allegations of unauthorized veterinary practice, held hearings, administered oaths, received evidence, issued subpoenas, made factual and legal determinations, and entered orders consistent with its findings.

60

The Eighth Circuit stated, "To the extent that the board weighed evidence, made factual determinations, determined sanctions, and issued written decisions, we conclude that these duties are functionally comparable to the duties performed by courts." Id. at 1011. The Eighth Circuit held that the veterinary board's actions were protected by quasi-judicial immunity.

The North Dakota Legislative Assembly has granted the Racing Commission the following powers:

1. Compel the production of all documents showing the receipts and disbursements of any licensee and determine the manner in which such financial records are to be kept.

2. Investigate the operations of any licensee and enter any vehicle or place of business, residence, storage, or racing of any licensee on the grounds of a licensed association to determine whether there has been compliance with the provisions of this chapter and rules adopted under this chapter, and to discover and seize any evidence of noncompliance.

3. Request appropriate state officials to perform inspections necessary for the health and safety of spectators, employees, participants, and horses that are lawfully on a racetrack.

4. License all participants in the racing and simulcast pari-mutuel wagering industry and require and obtain information the commission deems necessary from license applicants . . . .

5. Receive moneys from the North Dakota horse racing foundation for deposit in the purse fund, breeders' fund, or racing promotion fund in accordance with subsection 6 of section 53-06.2-11.

6. Adopt additional rules for the administration, implementation, and regulation of activities conducted pursuant to this chapter. The commission shall deposit any fees collected under authority of this subsection in the racing commission operating fund. Subject to legislative appropriation, the commission may spend the fees for operating costs of the commission.

N.D.C.C. § 53-06.2-05. The Racing Commission may issue, renew, deny, suspend, or revoke licenses under the certificate system and may terminate racing privileges. N.D.C.C. §§ 53-06.2-07

61

and 53-06.2-14.  The Racing Commission has the authority "to charge any licensee or permittee for a violation of these rules or of the pari-mutuel horse racing laws of this state; to conduct hearings and to impose fines and other penalties as provided by law and these rules; and to suspend, revoke, or encumber through conditions of probation licenses or permits."  N.D. Admin. Code § 69.5-01-02-01(1).

In this case, the Racing Commission refused to renew RSI's simulcast service provider license on December 22, 2003.  The decision to renew or not to renew a license is within the province of the Racing Commission's duties under N.D.C.C. § 53-06.2-07.  The Racing Commission is empowered to deny, suspend, and revoke simulcast service provider licenses for just cause, including any action or attempted action that is contrary to law.  See N.D.C.C. § 53-06.2-14.  At the time that the Racing Commission refused to renew RSI's simulcast service provider license, there were pending criminal actions in state and federal court against the Plaintiffs.  The Racing Commission is empowered to deny a simulcast service provider license so long as it complies with the requirements prescribed in N.D.C.C. § 53-06.2-15.  N.D.C.C. § 53-06.2-15 sets forth the procedure for revoking, suspending, or fining a simulcast service provider:

> The commission, on proof of violation by a licensee, its agents or employees, of this chapter or any rule adopted by the commission may, on reasonable notice to the licensee and after giving the licensee an opportunity to be heard, fine the licensee or revoke or suspend the license . . . .  Every decision or order of the commission must be made in writing and filed with the director for preservation as a permanent record of the commission.  The decision must be signed by the chairman, attested by the director, and dated.

N.D.C.C. § 53-06.2-15.

The North Dakota Racing Commission is entitled to absolute immunity when it acts in a quasi-judicial manner.  See VanHorn v. Oelschlager, 457 F.3d 844 (8th Cir. 2006) (finding that the

62

Nebraska State Racing Commission was entitled to absolute immunity for banning licensed veterinarians from treating race horses because the racing commission's powers in conducting disciplinary hearings were similar to judicial powers).  N.D.C.C. § 53-06.2-15 mandates that when the North Dakota Racing Commission revokes, suspends, or fines a simulcast service provider it must provide the provider with notice and an opportunity to be heard.  The Court finds that the procedures which the Racing Commission undergoes when revoking, suspending, or fining a simulcast service provider are quasi-judicial in nature.  Accordingly, the Court finds that the North Dakota Racing Commission is protected by absolute immunity for refusing to renew RSI's simulcast service provider license on December 22, 2003.

## IV.   <u>CONCLUSION</u>

The Defendants' motions to dismiss (Docket Nos. 5, 10, 12, and 15) are **GRANTED** pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Plaintiffs have failed to state a claim as to each of the Defendants upon which relief can be granted.

**IT IS SO ORDERED.**

Dated this 30th day of November, 2009.

<u>*/s/  Daniel L. Hovland*</u>
Daniel L. Hovland, District Judge
United States District Court